Filed 2/14/22  A.J. v. Superior Court CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| A.J. et al.,<br><br>　　　Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>　　　Respondent;<br><br>SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>　　　Real Party in Interest. | A163830<br><br>(San Mateo County Super. Ct. No. 20JD0208) |

　　　Petitioners A.J. (Father) and G.G. (Mother) (collectively, Parents) seek writ review (Cal. Rules of Court, rule 8.452) of a juvenile court order terminating reunification services and setting a hearing under Welfare and Institutions Code section 366.26.[1]  Parents challenge the juvenile court's determination that they were provided reasonable reunification services.  We deny the petitions.

---

　　　[1] All undesignated section references are to the Welfare and Institutions Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

*Petition, Detention, and Jurisdiction/Disposition*

In April 2020, the San Mateo County Human Services Agency (Agency) filed a section 300 petition for M.G. (Minor), then eight years old. The petition, as sustained, alleged that after Father was arrested on drug charges, Minor was left without a caretaker for three days; Mother could not care for Minor because her whereabouts had been unknown and she had a known substance abuse history; Father regularly leaves Minor at home alone for up to 15 hours per day; and Father failed to participate in a voluntary case plan. Minor was detained and placed in foster care.

Mother told the Agency Minor mostly lives with Father but Father brings Minor to see Mother. In May, Mother admitted a history of substance abuse but stated she had been clean for one week and agreed to participate in an alcohol and other drug (AOD) assessment. In June, Mother admitted to currently using drugs and said she was on a waiting list for a detox facility; later that month, Mother told the social worker she wanted to know about a treatment program and the social worker provided her with a referral. In late July, Mother told the social worker she was in jail "for a few days," and was planning to enter residential treatment but the program required a COVID test before admittance. During this time, the social worker consistently had substantial difficulty reaching Father, leaving him multiple unreturned voicemail and text messages. The few times she did speak to him he said he was willing to participate in services.

Following an August 11, 2020 jurisdiction/disposition hearing, the juvenile court sustained the petition, adjudged Minor a dependent of the court, and ordered reunification services. The case plan required Parents both to participate in a mental health assessment and obtain parent

2

education; in addition, Mother was required to enter a residential treatment program and Father was required to participate in random drug testing and an AOD assessment. Parents had regular supervised visits.

*Six-Month Review Period*

A new social worker was assigned to the case in early September 2020, approximately one month after disposition. The new social worker remained assigned to the case through the duration of the proceedings and testified at the contested 12-month review hearing. She was a native Spanish speaker and communicated with Mother and Father in Spanish.[2]

*Mother*

Mother was in jail on burglary and drug possession charges from early September until early November 2020. The social worker met with Mother twice while she was in jail to review her case plan. The social worker also contacted staff at the jail—a mental health clinician and an in-custody case manager—to ask about connecting Mother with services at the jail. The clinician told the social worker she would connect Mother with mental health services. The in-custody case manager told the social worker that, as Mother's release date was approaching, he talked to Mother about a three-month residential treatment program but she declined. The case manager also said Mother qualified for "Service Connect" upon her release, and they would assign her a case manager who could assist her with housing, drug treatment, and other needs.

The in-custody case manager told Mother to wait for Service Connect staff upon her release, but she did not. Mother contacted the Agency the next day and admitted she used drugs the previous day. Mother told the social

---

[2] The prior social worker used an interpreter to communicate with Mother and Father.

worker she was homeless and unable to connect with Service Connect. The social worker gave Mother the phone number for Service Connect and provided Mother with a $100 Clipper card. The social worker also accompanied Mother to a county-operated "community resource center," also referred to as a "CORE" agency, where residents are assigned case managers and can "get assistance with whatever you need, like housing, food, shelter, getting into a shelter, motel vouchers," and other services.

The social worker also called the county's "ACCESS Line" with Mother. The social worker subsequently explained, "The Access Line is like the main point of entry to a residential program. You could call the programs directly, but they are going to refer you to Access. . . . [T]his is the process that the County has in place of calling the Access Line directly, so they can just do like one intake and they can see which programs have a bed available." When a person calls ACCESS Line, "typically they put you on hold . . . from anywhere between 10 to 30 minutes. Then you get a live person, a clinician. And you tell them what you are calling about, whether typically mental health services or substance abuse services. And if they have a therapist available, they would do the intake right away. If they don't have someone available, they will get your information and they would tell you that we will call you back within two or three business days, and if you don't hear from us, call us back at this number."

When the social worker and Mother called ACCESS Line together in November 2020, Mother was able to complete an intake and was informed she would be contacted within two days. The following week, Mother told the social worker she had not heard back from ACCESS Line. The social worker offered to call again with Mother, but Mother said she would call on her own. The social worker also referred Mother to an organization for her to schedule

an AOD assessment and random testing. The following week, Mother said her phone had been stolen so she did not know if ACCESS Line had contacted her. The social worker again offered to call ACCESS Line with Mother but Mother declined and said she would do it herself. The social worker reminded Mother to schedule an AOD assessment and arranged for a clinician to contact Mother for a parenting assessment. The social worker offered to walk with Mother again to the community resource center, but Mother declined.

In December 2020 and January 2021, the social worker was unable to reach Mother despite multiple attempts. At the end of January, Minor's foster mother told the social worker that Mother had a new phone number, but Mother did not respond to the social worker's messages at that number. The parenting assessment clinician was also unable to reach Mother despite multiple attempts. Mother did not schedule an AOD assessment and had not returned phone calls from the AOD assessment organization. Mother missed all of her six random drug tests.

Mother had weekly virtual visits while she was in jail, and attended eight out of twelve in-person visits after her release. Mother was devoted, attentive, loving, and caring during visits.

*Father*

The Agency was unable to contact Father in September and October 2020 because his phone number was not working and his whereabouts were unknown.

In November 2020, the social worker finally connected with Father. Father told the social worker he was homeless. He said he was having back problems and needed to see a doctor, but did not have health insurance. The social worker referred him to a county benefits analyst for help with health

insurance, a shelter or motel voucher, and food assistance. She also referred him to ACCESS Line and twice offered to call with Father, but he declined and said he would call on his own. The social worker asked Father about entering a residential treatment program. Father expressed interest but told the social worker he had not used methamphetamine in a year and needed to prioritize working and finding housing so he could reunify with Minor. The social worker referred Father for an AOD assessment.

In December 2020 and January 2021, Father failed to show up for two scheduled AOD assessments. Father submitted to one out of ten random drug tests; the one test he submitted to, in January 2021, was positive for amphetamine and methamphetamine. Father completed a parenting assessment and the clinician determined Father did not need to attend a parenting class; however, she stated Father was very depressed and anxious and mental health should be a top priority. In January, the social worker followed up with the benefits analyst about Father's health insurance and shelter.

Father did not respond to the Agency's attempts to conduct visits from August through October 2020. After Mother's release from jail, Father attended in-person visits with Mother, and attended eight out of twelve visits. Father was engaged, attentive, and loving during visits.

*Six-Month Review Hearing*

The six-month review hearing was held on February 10, 2021. The juvenile court continued reunification services and set a twelve-month review hearing.

*Twelve-Month Review Period*

     *Mother*

From February through April 2021, the social worker did not know Mother's whereabouts and Mother was not responding to the social worker's messages about services, although Mother would contact the social worker about visitation. The social worker asked a visitation supervisor to give Mother a letter about services at a visit scheduled for April 5, but Mother did not show up for that visit so the letter could not be delivered.

On April 8, 2021, Mother was incarcerated for probation violations, including drug use. The social worker did not learn of Mother's incarceration until May, when another client who was incarcerated at the same facility told her. The social worker then met with Mother in jail. Mother was in county jail until June 2021 and participated in various programs, including an NA class and the "Choices" program.

In June 2021, Mother was transferred to state prison to serve an eight-month sentence. The social worker contacted prison staff to learn what services were available and arranged three supervised phone visits. Prison staff told the social worker Mother needed to wait 60 days before she could participate in services. Before the 60-day period was up, Mother was transferred to a different prison. The Agency contacted the new prison to set up visitation. About a month after this transfer, Mother was transferred back to the first prison, and within a few days was transferred to the county jail for the contested 12-month review hearing.

     *Father*

In late February 2021, Father told the social worker he was not using methamphetamine and his positive drug test result was because of pain medication he had taken. Father told the social worker he would text her a

picture of the medication but never did. The social worker and Father called ACCESS Line together but, after being on hold for over 15 minutes, the social worker had to leave and they called again together the following day. Father requested substance abuse and mental health services and was told he would be contacted within a few days.

Also in February, Father told the social worker he still did not have Medi-Cal benefits. The social worker contacted the benefits analyst she had referred him to in November, and a supervisor told the social worker they had trouble connecting with Father for the past few months. The supervisor provided direct contact information for a benefits analyst and the social worker encouraged Father to contact her. In March, the benefits supervisor informed the social worker that Father's Medi-Cal had been reinstated.

In mid-March, Father told the social worker his only barrier to services was that his tent had burned down, resulting in the loss of his belongings and bicycle. The social worker offered Father a Clipper card or bus pass but he declined. The social worker called with Father to schedule an AOD assessment and offered to transport Father to his drug test the next day, but Father declined the assistance. Father did not attend either the drug test or the AOD assessment. The only drug test Father took during the review period, in March, was positive for amphetamine and methamphetamine.

Also in mid-March, Father told the social worker ACCESS Line had contacted him and provided him with referrals for mental health programs, but he had lost the referral information. The social worker encouraged Father to call ACCESS Line and get the referrals again. She also referred Father to La Clinica Latina, a mental health clinic, and called with him, leaving a message and asking them to contact Father directly. The social worker gave Father La Clinica Latina's address and phone number so he

could follow up, and also gave him the name and contact information of another organization that provides sliding scale mental health services, Star Vista. The social worker could not call Star Vista with Father because that organization wants the client to call themselves. In May, the social worker asked Father if he had heard from La Clinica Latina or contacted them, and Father said he had not contacted them and did not know if they had called him back because he changed his phone number. The social worker gave him La Clinica Latina's contact information again. In June, Father said he had called Star Vista but no one answered. In July, the social worker again referred Father to La Clinica Latina, Star Vista, an AOD assessment, and drug testing. Father admitted he "was wasting time."

Also in July, Father told the social worker he was working with Juan Hernandez, an outreach worker with a homeless services nonprofit, to get into a residential program. In August, Hernandez told the social worker Father just needed to get a second COVID vaccine and a COVID test before scheduling an intake appointment for residential treatment.

During the review period, Father attended 10 out of 12 visits. He was attentive, loving, and affectionate with Minor.

*Combined Twelve-Month/Eighteen-Month Review Hearing*[3]

The Agency recommended reunification services be terminated. A contested evidentiary hearing was held over five days in August, September, and October 2021.[4]

---

[3] Although the hearing began as a 12-month review, it was continued several times and did not conclude until after the 18-month review date.

[4] During the evidentiary hearing, the Agency submitted three addendum reports setting forth new developments and supplementing prior reports in response to lines of questioning. Relevant supplemental information from the addendum reports is incorporated in the background

*Mother*

The social worker testified Mother had frequent telephone number changes. Mother was homeless or in custody for most of the dependency proceedings. In October 2021, Mother told the social worker that the social worker had done her job and " 'It is us the parents that have not done what we were told to do.' "

Mother was transferred to county jail for the duration of the contested hearing. According to addendum reports and documentation submitted by Mother, Mother participated in a number of programs at the jail in October 2021, including "Choices" (providing AOD, domestic violence, and parenting counseling), a self-awareness program, NA meetings, and therapy. Mother was expected to be released in January 2022 and told the social worker that she intended to go into a residential program after her release.

*Father*

The social worker testified Father's telephone number changed frequently and she had nine different numbers for him. Only once did he inform her about a new phone number; the other times, she found out his number had changed when he contacted her to confirm a visit or when she learned the information from Minor's foster family. Communication was not an issue with respect to visitation: Father was "excellent" at confirming visits with Minor by either telephone or text. However, when the social worker called or texted him about services, he often would not respond. On multiple occasions the social worker went to one of Father's visits to talk to him about services because he would not return her messages. When asked whether there was a possibility for Father to reunify if he were provided with an

---

facts above. At the conclusion of the hearing, Minor's counsel agreed with the Agency's recommendation to terminate services.

additional six months of services, the social worker was dubious, noting Father repeatedly indicated he was going to pursue services but then did not follow through.

Juan Hernandez, Father's case manager with a homeless services nonprofit, testified in August 2021. Father was homeless, undocumented, and interested in residential drug treatment. About a month earlier, Hernandez and Father called ACCESS Line and got Father on a list for a residential treatment referral. Less than a week later, a treatment program contacted Hernandez and said once Father got a second COVID vaccine and a rapid test, a bed was available for him.[5] Father had not yet been able to get his second vaccine because he lacked transportation and had been depressed, but Hernandez was planning to take Father to get the second vaccine after that day's hearing.

In a subsequently filed addendum report, the social worker stated that, on September 10, Hernandez informed the social worker Father did not get a second COVID vaccine after the hearing because the pharmacy Father went to had run out of vaccines. The social worker texted Father free COVID vaccine sites. The social worker tried to follow up with Father a few days later but was unable to reach him and was informed by Hernandez that his phone number was disconnected.

On September 17, the next hearing date, the social worker testified she talked to Father just before that day's hearing and he said he was going to get medically cleared and then enter a program. Hernandez told the social

---

[5] Although Hernandez also testified he had to "clear" Father's Medi-Cal, he later clarified to the social worker that he did not change Father's Medi-Cal status but rather had ACCESS Line approve Father for residential treatment.

worker it was a detox program.  Father had not yet gotten his second vaccine dose.  In a subsequently filed addendum report, the social worker stated Hernandez told her he had arranged for Father to be transported from court to a hospital after the hearing, but Father never received a medical clearance or entered detox.  Hernandez said Father told him no one was at the hospital and, after waiting for 30 minutes, Father left.

On the next hearing day, September 24, 2021, Father testified through an interpreter.  He testified that he has been depressed since Minor's removal but, when he called mental health clinics he had been referred to, they did not answer.  He called ACCESS Line six or seven times and was put on hold for 40 to 60 minutes.  On one of these calls he talked to a live person and was told his Medi-Cal needed to be in order to enter a program.

Father testified he was initially hesitant about entering a residential program, but when the social worker said she could help him find housing after the program, he said he was willing to do it.  The social worker later provided him with a list of referrals to programs and they tried calling some of them, but had no success.  Father tried calling more later but was either put on hold or got no answer.  Father did not do the AOD assessments because he knew he had a problem but "was looking for an alternative to be able to overcome it," and he did not consistently drug test because he knew the tests would be positive.  He testified his back pain did not affect his ability to participate in services.  He testified that when he went to the hospital after the last hearing, they kept him waiting while they tried to find out if there was room for him at the detox facility, and after waiting for six hours he left.  He was scheduled to get his second COVID vaccine after that day's hearing concluded, and had not been able to do so before because he lost the Clipper card the Agency gave him and his feet were bothering him from

12

too much walking. At this point in his testimony, the hearing day ended and Father's testimony was scheduled to resume on October 1, 2021.

Father was sick on October 1 so the hearing was continued to October 29. In an addendum report, the social worker stated she met with Father on October 22 and he was still not in residential treatment. On October 29, 2021, Father did not appear at the hearing. The juvenile court denied Father's counsel's request for a continuance.[6]

*Ruling*

After hearing argument, the juvenile court found reasonable services had been provided. The court terminated reunification services and set a section 366.26 hearing.

## DISCUSSION

"The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.'" (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415,

---

[6] Father had been informed about the October 29, 2021 hearing by both the social worker and Hernandez. All parties agreed to let Father's partial testimony stand without the opportunity for cross examination.

13

1426.)  We review the juvenile court's reasonable services finding for substantial evidence.  (*In re T.G.* (2010) 188 Cal.App.4th 687, 697.)

Parents argue ACCESS Line was not an accessible service for them because it required waiting on hold and being able to receive callbacks, and Parents lacked consistent phone numbers.  We disagree that Parents' frequent phone number changes rendered ACCESS Line inaccessible.  Parents could call ACCESS Line if their phone number changed to inform them of the new contact information or get referrals.  The social worker called ACCESS Line with both Mother and Father, and offered to call multiple additional times.  Parents both completed intakes with ACCESS Line and Father received referrals from ACCESS Line.  While Parents' frequent phone number changes may have made ACCESS Line more difficult, it did not render it an unreasonable service.

Parents also challenge the reasonableness of ACCESS Line because they had only limited-scope Medi-Cal.  Father has limited-scope Medi-Cal because of his undocumented status.  The social worker assumed Mother's Medi-Cal was also limited scope because of Mother's undocumented status.  Limited-scope Medi-Cal covers emergency services and may cover mental health and substance abuse treatment in certain circumstances.  ACCESS Line works with clients both with and without Medi-Cal, and will assist clients in learning what is covered by their insurance.  Indeed, ACCESS Line obtained Father placement in residential treatment in the summer of 2021 and provided Father with referrals for mental health services.  Parents' limited-scope Medi-Cal did not render ACCESS Line an unreasonable service.

Mother argues the Agency provided her with substance abuse and mental health referrals to referral services (ACCESS Line, Service Connect,

and the community resource center), rather than to actual treatment providers, and this impermissibly placed the burden on Mother to identify treatment providers. Father makes a similar argument with respect to ACCESS Line. ACCESS Line provides referrals to specific providers after conducting an intake to determine appropriate services and eligibility. Service Connect would have provided Mother with a case manager to assist her in obtaining services. The community resource centers assign case managers to clients and provide day shelters, motel vouchers, and other assistance. None of these "referral services" required Parents to identify treatment providers on their own, and they were not unreasonable. (Cf. *In re T.W.-1* (2017) 9 Cal.App.5th 339, 346 ["The initial case plan filed prior to disposition failed to identify any service providers and instead placed the burden on Father to locate services. The November case plan identified one program but provided no contact information or instructions about how Father could enroll in services."]; *In re K.C.* (2012) 212 Cal.App.4th 323, 330 ["the Department appeared to delegate the burden of finding and obtaining suitable services to Father himself"].)

Mother argues the Agency's only referral for residential treatment was a November 2020 referral to ACCESS Line. The Agency also referred Mother for an AOD assessment and provided her with contact information for Service Connect, either of which could have led to a residential treatment referral. For much of the time Mother was not in custody, she was not responding to the social worker's messages unless it was about visitation. Mother's suggestion that the social worker should have made more efforts to accommodate Mother's failure to respond is unavailing. "While it is true the social worker is charged with maintaining reasonable contact with the parents during the course of the reunification plan, [the social worker] cannot

15

do so without some degree of cooperation from the parent." (*In re T.G., supra,* 188 Cal.App.4th at p. 698; see also *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5 ["The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of [the parent's] minor children is not a requirement that a social worker take the parent by the hand and escort [the parent] to and through classes or counseling sessions."].)

Parents both argue the mental health services they received were inadequate. The social worker inquired about getting Mother a mental health assessment at the county jail in September 2020; called ACCESS Line with Mother to obtain counseling and other services in November 2020, and offered to call ACCESS Line back multiple times; was unable to talk to Mother about services for some months because Mother would only communicate with the social worker about visitation; and attempted to deliver a letter to Mother that included referrals for mental health clinics at an April 2021 visit, but Mother did not attend the visit. Father complains that ACCESS Line would not refer him to an individual therapist because of his limited-scope Medi-Cal, but ACCESS Line did provide him with referrals to mental health clinics, which he lost. The social worker also provided referrals to community mental health clinics and attempted to call one with Father; she did not attempt to call the other with Father because that organization wanted the client to call themselves. The Agency's mental health services were reasonable.

Mother argues the services provided when she was incarcerated between April and October 2021 were inadequate. When a parent receiving reunification services is incarcerated, the social services agency "cannot tell prison officials how to run their institutions" but "can: notify the prison an

16

incarcerated parent is in need of reunification services; determine whether any appropriate services are available at the particular institution in question; and explore whether changes in the housing of the parent prisoner can be made to facilitate the provision of such services consistent with legitimate prison and public safety concerns." (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1013.) Mother did not inform the social worker of her incarceration in April 2021 and the social worker did not learn of it until being informed by another client in May. When the social worker talked to Mother in jail, Mother told the social worker she was going to go to prison or be deported. Less than a month later, Mother was transferred to prison. The social worker contacted prison staff to help connect Mother with services and was told Mother needed to be there for 60 days before she could participate in services; before the 60 days passed Mother was transferred to another prison. The Agency left three messages with the services coordinator at Mother's new prison and, when the services coordinator finally returned the message, she explained she was the only social worker for the prison's 250 inmates. The social worker testified her primary focus while Mother was at this prison was on setting up visits, which took substantial effort by the Agency to coordinate (and were not successful before Mother was transferred back to the first prison).[7] After Mother was transferred to county jail, the social worker contacted jail staff to connect Mother with services at the jail and ensured Mother was cleared to participate in these services. Mother's frequent transfers between facilities made it difficult to connect her to services, but the Agency did contact facilities and attempt to connect Mother with services. The services were reasonable.

---

[7] Mother acknowledges the efforts to arrange visitation while Mother was in custody were reasonable.

Mother's final argument is she was not provided with reasonable services with respect to parenting education. In December 2020, the Agency referred Mother to a clinician for a parenting assessment, but the clinician was unable to reach Mother despite multiple attempts. The social worker testified that the assessment could not be completed for an incarcerated parent, so she did not pursue it after Mother's incarceration. Mother argues it was unreasonable to leave this requirement as part of Mother's case plan after she was incarcerated and unable to complete it, and the Agency should have sent Mother parenting materials so she could review them while incarcerated. The social worker testified Mother had never been assessed so she did not know whether there was a need for parenting education and, if so, what type or level of parenting.[8] As the Agency argues, parenting education was not the primary obstacle Mother faced—she was loving and appropriate during visits—and it was not the reason the juvenile court terminated services.[9] Any concern with respect to parenting services does not render the overall services provided unreasonable.

Father cursorily asserts he was not given enough time to complete services. Father received 18 months of services which was ample time.

Father contends he got "little to no help" overcoming barriers to entering residential treatment, specifically, getting a second COVID vaccine

---

[8] After the issue was raised at trial, the social worker did send Mother parenting handouts.

[9] In issuing its ruling, the court stated "both mother and father are obviously addicted to drugs. They are homeless as a result of that addiction and that is their most important goal is to get their next drug because of their addiction." The court later found, "Based on the evidence that has been presented, neither parent has addressed their serious drug addiction problem. Neither parent has complied with the case plan."

and getting medically cleared for a detox program. We disagree. The social worker offered help with transportation to a vaccine provider and referred Father to free vaccine services. The social worker determined Father had transportation to get medically cleared, offered her support, and asked Father if he needed any assistance with the medical clearance process.

Father also argues the social worker should have been focused on getting Father into a residential treatment program instead of an AOD assessment and drug testing because "[e]veryone knew he needed a residential program!" Father repeatedly denied having a drug problem. The social worker referred him to ACCESS Line, which would have been able to clear him for a residential program (as it did when he called with Hernandez in the summer of 2021). Moreover, getting an AOD assessment could have also led to a residential treatment referral. In short, the social worker's efforts were appropriate and reasonable.

Finally, Father argues he had unique barriers—he was depressed, Spanish-speaking, undocumented, homeless, without a reliably working phone, and receiving services during the COVID pandemic—yet was given "little to no help other than being told to call various people." The background set forth above belies this argument.

In sum, the juvenile court's determination that the Agency provided reasonable services to both Mother and Father is amply supported by substantial evidence.[10]

---

[10] Because of this conclusion, we need not decide the appropriate remedy if reasonable services had not been provided.

DISPOSITION

The petitions are denied. The requests for a stay of the section 366.26 hearing scheduled to begin on February 28, 2022 are denied. This decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____
SIMONS, J.

We concur.

_____
JACKSON, P. J.

_____
BURNS, J.

(A163830)